In the Matter of GRACE INSTITUTE, Appellant, *v.* ROBERT D. CLARK, as Acting Commissioner of Water Supply, Gas and Electricity of the City of New York, et al., Respondents.

First Department, December 24, 1970.

*John R. Vaughan* of counsel (*Lawrence J. McKay* and *Joel C. Balsam* with him on the brief; *Cahill, Gordon, Sonnett, Reindel & Ohl,* attorneys), for appellant.

*Edith I. Spivack* of counsel (*Edward J. McLaughlin* and *Russell D. Scott* with her on the brief; *J. Lee Rankin,. Corporation Counsel,* attorney), for respondents.

McGIVERN, J.   In the year 1897, before the incorporation of New York City into " Greater New York ", the brothers Grace founded Grace Institute.   Legally, it was a membership corporation by virtue of an act of the State Legislature, chapter 285 of the Laws of 1897.   Its exalted aim was " to furnish women and girls instruction in such of the trades and occupations in which women are or may be employed, as well as in such branches of domestic arts and sciences and of useful and practical knowledge  *  *  *  to the end that they may become useful and virtuous citizens."

From 1897 to 1956, the Institute carried on in premises known as " the old Moore Mansion " located on West 60th Street in a deprived area populated by immigrants and the children of immigrants.   And for generations its ministrations were freely given to female children and mothers from the neighboring cold-water flats.   Come 1956, the property was condemned by the Triborough Bridge and Tunnel Authority to make way for the gigantic Lincoln Center project.   In 1960, the Institute, forced to move, commenced construction of a combined apartment-school building on East 65th Street.   And in 1962, the doors of the " old Moore Mansion " were closed forever.

Commencing 1965, the Institute began receiving bills from the City of New York, for the first time, for water and sewer charges, attributable to its new structure, which consisted of a 14-story building, the first three floors of which were devoted to the purposes of free instruction, in accordance with the Institute's ancient charter, and the remaining floors to rented apartments. As these bills were received, the Institute filed with the Comptroller applications for cancellation of such charges pursuant to section 93d–9.0 of the Administrative Code of the City of New York, which allows the Board of Estimate to cancel such charges against real estate exempt, as the Institute was and is, from such liens pursuant to the provisions of section 425 of the Real Property Tax Law.

While the Institute's applications were pending, the Comptroller offered, November 1, 1967, to apportion the water and sewer charges, canceling the amount allocable to the charitable

corporation, and frankly recognizing that "metering the apartments might result in a large expense", and further, "It might, therefore, make more sense to have the Department fix water charges on a frontage basis". But, on February 5, 1968, the Acting Commissioner of the Department of Water, Gas and Electricity denied the application, suggesting, however, that further request for relief be pursued before the Comptroller. Following conferences, that too was denied by the Comptroller and the original compromise suggestion of the Comptroller was withdrawn by letter dated March 26, 1969.

Then, by petition dated April 28, 1969, the Institute applied at Special Term for a judgment under article 78 of the CPLR, reversing the determination of the city bureaus and for a re-recognition of its long honored exemption, as a charitable institution, from water rates and sewer rental charges. Special Term dismissed the petition and denied all relief.

We disagree. Grace Institute, since the year 1897, has enjoyed an overriding exemption from the payment of water use; reaffirmed by chapter 433 of the Laws of 1957. That the statute admits of an exemption for that portion of the edifice used for exempt activities is clear, both from its language and its history. (Cf. L. 1887, ch. 696; L. 1902, ch. 605.) And no amending legislation has ever required that the premises be used in their entirety for a philanthropic purpose. Special Term correctly recognized this when it wrote: "So, too, the pertinent statute (Laws of 1957, ch. 433) contains clear indication that it was the Legislature's intent to exempt from taxation only those portions of the real estate actually used for exempt activities. (See, generally, Y. M. C. A. of N. Y. v. Mayor, 113 N. Y. 187; Bush Terminal Co. v. City of N. Y., 282 N. Y. 306, 321.)" And that is all that the petitioner seeks, not total exemption for the entire complex, but only an exemption reasonably proportionate to the space occupied and use made by the membership corporation. We believe that such an accommodation can be made and should be made.

Nor do we think the practicalities of such an accommodation present insuperable difficulties. They were first suggested by the Comptroller, and indeed he knowingly recognized that forcing the Institute to meter the apartments would "result in a large expense". In our view, such a solution is not only unnecessary, but would impose an unreasonable burden on a charitable institution already recurrently sustaining an annual deficit.

We perceive no especial problem in devising a formula granting partial exemption to the Institute on the basis of an estimate based on the number and type of outlets used for school pur-

poses, and in the case of common facilities, such as air-conditioning, an exemption based upon a percentage of floor space. The Comptroller suggested a year's experience would be sufficient. The result would be no less scientific than the factors used for an assessment based on a frontage charge, which has always been a " reasonably approximate " formula, long accepted by the city. In the instant case, dealing as we are, with a charitable institution, long favored by public policy, we can do no other.

A recent precedent embraced the solution we hereby direct. In the case of *Society of New York Hosp.* v. *Feldman* (N. Y. L. J., June 25, 1970, p. 11, col. 4 [Sup. Ct., N. Y. County]), the learned Justice at Special Term directed an effort be made to arrive at a formula permitting a proportionate exemption in respect of water and sewer rates in favor of a hospital owning an apartment complex. Much the same contentions were raised therein as in the instant proceeding. We believe that liberal treatment should be accorded the petitioner, as a charitable institution, and that the strict construction urged by the respondent would thwart the commands of the founding and succeeding statutes, which have for so long sheltered the petitioner from the taxes in question. (See *People ex rel. Doctors Hosp.* v. *Sexton*, 267 App. Div. 736, affd. 295 N. Y. 553.)

Accordingly, the judgment of Special Term should be reversed, on the law, without costs and without disbursements, and the proceeding should be remanded to the Commissioner for the purpose of devising a formula in accordance with the views expressed herein, to the end that partial exemption from water charges and sewer rents be extended to the petitioner.

NUNEZ, MCNALLY and TILZER, JJ., concur.

Judgment, Supreme Court, New York County, entered on June 4, 1970, unanimously reversed, on the law, and vacated, without costs and without disbursements, and the proceeding remanded to respondent Commissioner for the purpose of devising a formula in accordance with the views expressed in the opinion of this court filed herein, to the end that partial exemption from water charges and sewer rents be extended to the petitioner.